IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

File No. 5:23-CV-00220-BO

FILED

APR 24 2023

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

|  |  |  |
|---|---|---|
| OZIE L. HALL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| MATTHEW L. LILES, individually | ) | [42 U.S.C. § 1983] |
| and as Assistant Attorney General of the | ) | [42 U.S.C. § 1985] |
| State of North Carolina; JAMES STEVEN | ) | |
| BASS, individually and as Assistant | ) | |
| State Auditor of the State of North Carolina; | ) | |
| ALEXENDRA S. SCHAUSS, individually | ) | |
| and as Director of the Division of School | ) | |
| Business, N.C. Department of Public | ) | |
| Instruction; LEIGH ANN KERR, individually | ) | |
| and as Assistant Director of the Division of | ) | |
| School Business, N.C. Department of Public | ) | |
| Instruction; EUGENE THOMAS BRUTON, | ) | |
| individually and as Staff Accountant in the | ) | |
| Division of School Business, N.C. Department | ) | |
| of Public Instruction. | ) | |
| | ) | |
| Defendant(s) | ) | |
| | ) | |

COMES NOW the Plaintiff, Ozie L. Hall, Jr., and hereby complains of the below

Defendants as follows:

## INTRODUCTION

In this case, the Plaintiff Ozie L. Hall, Jr., seeks *inter alia* to recover general, compensatory,

special, and punitive damages from the Defendants for violations of Plaintiff Hall's federal

-1-

constitutional and civil rights. Defendants committed violations of Plaintiff's rights while acting under color of state law, custom, and usage. Defendants also committed "malicious prosecution," "abuse of process," "civil conspiracy," and "violation of Plaintiff's state constitutional rights." In addition, Plaintiff Hall seeks declaratory and injunctive relief. This case arises from a culture and pattern of misconduct, within the North Carolina Department of Public Instruction, that began before 2007, matured into a conspiracy, and culminated in a failed individual capacity civil prosecution of Plaintiff Ozie L. Hall, Jr., in the case styled "*State of North Carolina, ex rel. Roy Cooper v. Kinston Charter Academy, et al, Wake County Superior Court, File No. 16 CVS 5628*" that was terminated in Plaintiff Hall's favor on 10 June 2022.

## JURISDICTION AND VENUE

1. This Court has jurisdiction *inter alia* pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1343; and 28 U.S.C. § 1367 and other applicable laws.

2. Venue is proper in the Western Division of the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391 and other applicable laws.

3. All Defendants generally, have waived the defense of sovereign or public official immunity.

4. All Defendants conduct complained of in this action are malicious and corrupt and are not protected by a defense of sovereign or public official immunity.

## THE PARTIES

5. Plaintiff, Ozie L. Hall, Jr., at times relevant is a U.S. Citizen and resident of the State of North Carolina and resides in Harnett County at 56 Falling Water Road, Spring Lake, North Carolina 28390.

6. Plaintiff Hall is suing in his individual capacity.

7. Defendant, Matthew L. Liles, at all times relevant, is a resident of Wake County, North Carolina residing at 720 New Road, Raleigh, North Carolina 27608 and is a former Assistant Attorney General of the State of North Carolina.

8. Defendant Liles is being sued herein in both his individual and official capacity.

9. Defendant, James Steven Bass, at all times relevant, is a resident of Durham County, North Carolina residing at 8 Lake Village Drive, Durham, NC 27713 and is a former Assistant State Auditor of the State of North Carolina.

10. Defendant Bass is being sued herein in both his individual and official capacity.

11. Defendant, Alexandra S. Schauss, at all times relevant, is a resident of Wake County, North Carolina residing at 114 Ashley Glen Drive, Cary, NC 27313 and is the former Director of the Division of School Business of the North Carolina Department of Public Instruction and remains currently employed at the North Carolina Department of Public Instruction as its Chief Financial Officer.

12. Defendant Schauss is being sued herein in both her individual and official capacity.

13. Defendant, Leigh Ann Kerr, at all times relevant, is a resident of Wake County, North Carolina residing at 4409 Keswick Drive, Raleigh, North Carolina 27609 and is the former Assistant Director of the Division of School Business of the North Carolina Department of Public Instruction.

14. Defendant Kerr is being sued in both her individual and official capacity.

15. Defendant, Eugene Thomas Bruton, at all times relevant, is a resident of Johnston County, North Carolina residing at 105 Cobblestone Court, Smithfield, North Carolina 27577 and is a former Accountant in the Division of School Business of the North Carolina Department of Public Instruction.

16. Defendant Bruton is being sued in both his individual and official capacity.

## STATEMENT OF THE FACTS

17. Plaintiff Hall was contracted *inter alia* to serve as Chief Executive Officer/Principal (CEO) of Kinston Charter Academy (KCA), a North Carolina nonprofit corporation/North Carolina public charter school located in Lenoir County, North Carolina in or around 2007.

18. Plaintiff Hall was initially engaged by KCA to conduct an analysis of KCA financial and operating status and provide support and management guidance to KCA's nonprofit board of directors.

19. At the time Plaintiff Hall was engaged by KCA, Plaintiff Hall held a Bachelor of Science degree in business administration with a concentration in management and organizational development and a Master of Science degree with a concentration in general administration and Plaintiff had relevant qualifying experience.

20. Plaintiff Hall subsequently earned a Master of Arts degree in Education with a concentration in curriculum and instruction from Central Michigan University and a training Certificate in "High Performing Charter Schools" from Harvard University's Graduate School of Education and is the author of published books entitled "Seven Steps: To Start a Public Charter School," "Charter School Board Members," and "Converting Traditional Public Schools to Charter Schools."

21. Plaintiff Hall was an educational advocate and civil rights activist since the 1980s and advocate for the rights of Black students and other disadvantage groups and individuals, including economic disadvantaged White students.

22. In the 1980s, Plaintiff Hall served as a plaintiff appointed class representative on the Delaware State Board of Education Desegregation Advisory Council and was a Conferee

-4-

of the historic "1985 National Conference on Educating Black Children: Blue Print for Action" convened by the late U.S. Congressman, the Honorable Augustus Hawkins.

23. In the 2,000s, Plaintiff Hall served as President of the Pitt County Coalition for Educating Black Children, a class representative in the "Unitary Status" case of *Everrett, et al v. The Pitt County Board of Education*, U.S. District Court, EDNC File No. 6:69-cv-00702-H, that was represented by legal counsel from the UNC Center for Civil Rights, the National Lawyer's Committee on Civil Right under Law, and the *pro bono* division of the Dechert Law Firm.

24. Plaintiff Hall become well known in North Carolina as a result of his association with the high profile "Unitary Status" case in Pitt County and Plaintiff became well known to the State Board of Education, the North Carolina Department of Public Instruction, and North Carolina's education establishment.

25. In the 2,000s, Plaintiff Hall served as a member of the East Carolina University Chancellors Community Advisory Council, and Legal Redress Committee Chair of the Pitt County Branch of the National Association for the Advancement of Colored People.

26. At the time Plaintiff Hall became the CEO of KCA, KCA owned a 52,000 square foot facility located on a 14-acre lot located at 2000 Martin Luther King Drive in Kinston, North Carolina which it purchased with the proceeds of outstanding loans from the United States Department of Agriculture (USDA) ($1 million at 4% per annum) and Self-Help Ventures Fund ($1.5 million at 8.25% per annum fully guaranteed by the USDA), at a total purchase price of $2.5 million with the facilities, at the time, having a then current appraised value of $5.8 million at occupancy.

Case 5:23-cv-00220-BO-BM    Document 1    Filed 04/24/23    Page 5 of 62

27. At the time Plaintiff Hall became CEO of KCA, KCA already had a cumulative operating deficit of approximately $354,000 as reported in its independent single audit report required by State statute.

28. Plaintiff Hall began working with the KCA board of directors to develop a strategic plan to eliminate the school's cumulative operating deficit, increase student enrollment, improve overall operations, and refinance the school's facilities.

29. KCA Board's long-range goal was to increase student enrollment to its building capacity which exceeded 400 students.

30. The mortgage loan with Self-Help Ventures Fund had predatory provisions including a seven-year prepayment penalty and above market interest rate even though the loan was fully guaranteed by the USDA.

31. In or about 2008, Plaintiff Hall learned from the Local Government Commission staff and independent research that North Carolina public charter schools are not subject to the North Carolina Balanced Budget Act and that KCA was not required by law to fully fund the schools cumulative operating deficient in a single year.

32. Prior to Plaintiff's Hall's tenure as CEO of KCA, KCA board of directors engaged the accounting and financial services of Acadia Northstar, LLC to manage its finances reportedly under pressure from Eugene Bruton, a staff accountant within the Division of School Business of the North Carolina Department of Public Instruction.

33. In or about 2008, Plaintiff Hall determined that Acadia Northstar, LLC's monthly financial reports to the KCA board were misleading and inaccurate and created such confusion on the part of the KCA Board that they were an ineffective tool in the board's management

Case 5:23-cv-00220-BO-BM    Document 1    Filed 04/24/23    Page 6 of 62

and oversight duties of the board without supplemental information and extensive explanations.

34. In or about 2008, Plaintiff Hall recommended to the KCA board of directors that the board consider termination of Acadia Northstar, LLC and consider alternative accounting and financial services vendors.

35. In or about 2008, Plaintiff Hall was approached by Eugene Bruton, a staff accountant in the Division of School Business, and admonished not to terminate Acadia Northstar, LLC and essentially threatened that DPI would look favorably upon KCA if it kept Acadia Northstar, LLC as its accounting and financial services vendor and the school's cumulative deficit would not be an issue.

36. On information and belief, Acadia Northstar, LLC's contract with KCA had a severe liquidated damages clause and penalties that, along with Division of School Business threats, was a disincentive to immediately terminate the contract with Acadia Northstar, LLC.

37. By 2010, Plaintiff Hall became aware of other Black racially identifiable North Carolina public charter schools that reportedly were threatened by Eugene Bruton or pressured to use Acadia Northstar, LLC as a financial services vendor.

38. In or about 2010, Plaintiff Hall became the Legal Redress Committee Chair of the Association of African American Charter School Administrators and began examining a reported pattern of race-based discrimination in the closure of approximately 30 charter schools that had closed in North Carolina since the Charter School Act of 1996 and possible misconduct on the part of Division of School Business officials with respect to forcing identifiable minority charter schools to use Acadia Northstar, LLC as a financial services

Case 5:23-cv-00220-BO-BM    Document 1    Filed 04/24/23    Page 7 of 62

vendor and other targeted acts of race-based discrimination and/or possible criminal racketeering.

39. In 2010, DPI proposed a retroactive rule that would require the closure of all North Carolina public charter schools whose annual performance composite was below 60 percent that did not make expected academic growth in two out of any three-year period which would have required the immediate closure of nearly all North Carolina public charter schools serving a significant percentage of Black students within the State.

40. In 2010, the Statewide annual performance composite for Black students was significantly below 60 percent according to DPI published reports and nearly all historically did not make expected growth at some time in the past for two out of a three-year period.

41. There were minority majority charter schools that were performing well currently but had a period of poor performance in the past that would be subject to the discriminatory closure policy because of alleged past performance deficits.

42. There was a consensus among many Black charter school leaders within the Association of African American Charter School Administrators that DPI's proposed policy was a specific race-based attack on Black public charter schools and Black communities across the State.

43. On information and belief, evidence suggested that because the State imposed a 100 cap on the number of public charter schools in the State certain officials were targeting the closure of racially identifiable Black charter schools to make way for "White flight" public charter schools with Defendants Bruton and Schauss conducting or facilitating frontline attacks on targeted public charter schools.

-8-

44. The Association of African American Charter School Administrators was formed in 2010 and included leaders from Alpha Academy, Quality Education Academy, Torchlight Academy, and Kinston Charter Academy and all except Kinston Charter Academy were under immediate threat of closure due to the racially discriminatory policy.

45. In or about April 16, 2010, the Association of African American Charter School Administrators filed a civil rights complaint with the U.S. Department of Education, Office of Civil Rights, against the North Carolina State Board of Education, Department of Public Instruction, and Office of Charter Schools alleging raced-based discrimination and challenging the discriminatory policy. [**Exhibit 1: Office of Civil Rights Complaint, dated April 16, 2010**].

46. The State Board of Education and DPI ultimately adopted a version of the race-based policy that eliminated the *ex post facto* component, and the N.C. Legislature subsequently codified it into State law.

47. Office of Charter School and DPI staff made it known to Plaintiff Hall that DPI officials were upset over Plaintiff Hall's involvement in the Office of Civil Rights Complaint.

48. On information and belief, the first charter school that would subsequently become the victim of the race-based law and State Board/DPI policy was a virtual school managed by the white former Director of the Office of Charter Schools, Joel Medley, so reportedly, the Legislature, State Board, and DPI changed the policy.

49. KCA board of directors gradually reduced its cumulative operating deficit from approximately (-$354,000) in 2007 to an approximate +$49,000 operating surplus in 2012 consistent with the Local Government Commission opinion that charter schools are not required to eliminate cumulative deficits in any single fiscal year.

50. At no time during Plaintiff Hall's tenure as CEO/Principal operating KCA did the North Carolina Department of Public Instruction claim that Plaintiff Hall "mismanaged" KCA prior to their efforts to close the school in the last year of its operations and no such claim was ever made to the KCA Board.

51. On information and belief, Defendant Alexandra S. Schauss served as Assistant Director and subsequently as the Director of the Division of School Business from 2011 through after 2017 at which time Schauss became the Chief Financial Officer of the N.C. Department of Public Instruction.

52. On information and belief, Defendant Leigh Ann Kerr served as Assistant Director of the Division of School Business from March 2013 to March 2020 and was the direct supervisor of Defendant Bruton during her tenue.

53. On information and belief, Defendant Eugene Bruton served as a Staff Accountant in the Division of School Business from prior to 2006 to after the state filed its lawsuit in 2016 against KCA naming Plaintiff Hall in his individual capacity.

54. In or about 2010, Plaintiff Hall reported to the then Division of School Business Director Paul La Suer that Eugene Bruton was engaged in misconduct in attempting to force KCA to continue to contract Acadia Northstar, LLC.

55. On information and belief, La Suer's response to the report of misconduct was to immediately contact Acadia Northstar, LLC to inform them of the complaint but no action was reportedly taken to conduct any investigation.

56. A later report to Joel Medley, Director of the Office of Charter Schools, regarding Defendant Bruton and Acadia Northstar, LLC only resulted in Medley immediately

-10-

contacting Acadia to inform them of the report, but no investigation was reportedly conducted.

57. Defendants Schauss and Bruton were aware of the complaint filed by Plaintiff Hall and the Association of African American Charter School Administrators, the allegations of race-based discrimination in 2010, and the reports of Defendant Bruton's misconduct.

58. Defendant Bruton falsely testified under oath in a deposition dated 18 April 2018 that he was unaware of any reports of misconduct which was directly contradicted by written documents obtained during discovery in the civil case.

59. Defendant Bruton's 18 April 2018 deposition testimony that the December 2012 false noncompliance finding claiming KCA had an approximate $285,000 questioned cost originated with the Local Government Commission was contradicted by the deposition of James Burke, Assistant Director of the State and Local Government Finance Division of the N.C. Department of the Treasury dated 31 May 2018.

60. Defendants Schauss and Bruton contemporaneously knew that KCA terminated its relationship with Acadia Northstar, LLC and engaged the services of Thomas & Gibbs CPAs as its financial services vendor in or about 2011.

61. Defendants Schauss and Bruton were aware that KCA's charter renewal year was the 2013-2014 school year and discussed the same with Plaintiff Hall well in advance.

62. Defendant Bruton created a charter school renewal non-compliance report that falsely claimed that KCA had an approximate $285,000 questioned cost for using state funds to illegally pay a mortgage.

63. Defendants Schauss and Bruton were aware that Plaintiff Hall served as President of the Pitt County Coalition for Educating Black Children, the Plaintiff class representative group

-11-

in *Everrett v. Pitt County Board of Education* unitary status case and Schauss and Bruton openly expressed disfavor to Plaintiff Hall.

64. In or about 2012, Defendants Schauss and Bruton had a meeting of the minds and formed a conspiracy to use illegal means to close KCA, discredit and damage the reputation of Plaintiff Hall, and violate and impair Plaintiff Hall's right to practice his profession as an educator and educational advocate.

65. On information and belief, Defendants Schauss and Bruton had placed KCA on a watch list along with other charter schools *inter alia* holding memberships or affiliated with the Association of African American Charter School Administrators, and Defendants Schauss and Bruton's racially based animus toward Plaintiff ripened to the formation of a conspiracy.

66. Defendants Schauss and Bruton were intimately aware of KCA's plans to eliminate its cumulative deficit, renew its charter, refinance its mortgage, and draw equity from its real estate holdings going into its renewal year based upon communications with KCA's CEO, board chair, and the school's then current lenders.

67. On information and belief, Defendant Kerr became employed as the Assistant Director of the Division of School Business in March 2013 and subsequently had a meeting of the minds with Defendants Schauss and Bruton to destroy KCA and discredit Plaintiff Hall based upon racial animus and the desire to silence Plaintiff Hall in exercising his rights to free speech.

68. Defendants Schauss and Bruton knew that KCA ended the 2011-2012 school year with an operating surplus and was postured to refinance its facilities, draw equity for facilities

-12-

repairs and future operations, and move into its charter renewal year in a strong position with a high likelihood of an extended charter renewal of five years or more.

69. Defendants Schauss and Bruton were aware of KCA past years' annual cash flow needs, operating patterns, and past cash requests.

70. Defendants Schauss and Bruton decided to use their knowledge of KCA's operations to form a plan and engage in unilateral conduct to undermine the school's operations, thwart its refinancing effort, and ultimately close the school and discredit Plaintiff Hall.

71. North Carolina public charter schools generally receive an initial allotment of State Public School Funds of 34% of their initial planning allotment in July.

72. North Carolina public charter schools generally receive a second allotment of State Public School Funds in October or early November equal to the adjusted balance of 68% of it calculated "Average Daily Membership" (ADM).

73. North Carolina public charter schools generally receive the remaining 32% of their allotted State Public School Funds in February or March of the school year.

74. Some North Carolina public charter schools are allowed to receive the balance of their State Funds allotment in November.

75. Defendants Schauss and Bruton knew that KCA typically requested an advance from its February or March allotment in December to meet its cash flow needs and this practice occurred multiple years without issue.

76. On information and belief, the charter school allotment schedule was not mandated by State statute or official State Board Policy and Defendant Schauss had approved allotment cash advances for KCA in prior three years.

77. On information and belief, Defendants Schauss and Bruton knew that KCA would request a cash advance in or about December for the 2012-2013 school year and that KCA would begin applying to refinance its mortgage once the 2012 annual audit became final.

78. On information and belief, many North Carolina public charter schools received 100% of their State Public School Funds by the October or November allotment based upon a subjective analysis by Defendants Schauss and Bruton.

79. Defendants Schauss and Bruton knew that 2012-2013 school year was critical to the success of Plaintiff Hall and KCA's plans to refinance KCA's school facilities, and they also knew that KCA had eliminated its cumulative operating deficit as of June 30, 2012 and conditions were ripe for refinance.

80. In or about October 2012, Plaintiff Hall and KCA received a memo from Defendant Schauss dated September 5, 2012 unilaterally directing that cash advances were no longer permissible. [**Exhibit 2: Memorandum from Alexis Schauss, dated September 5, 2012**].

81. On information and belief, Defendant Schauss's timing in unilaterally prohibiting heretofore permissible cash advances was calculated to disrupt KCA's cash flow, thwart the school's operations, limit KCA ability to timely find alternative financing, damage KCA's renewal chances, and damage the reputation of Plaintiff Hall.

82. In a deposition Defendant Schauss colleague, Roxanne Bernard, in the Division of School Business, testified that KCA was the only school affected and indicated the policy was specifically directed at KCA.

83. The impact of the September 5, 2012 unilateral policy change was that it disrupted KCA's cash flow and placed the school in a cash crisis in the year leading up to the renewal year.

-14-

84. On information and belief, in December 2012, Defendants Schauss and Bruton agreed that Defendant Bruton would engage in another overt act to shut down KCA, and discredit Plaintiff Hall by creating a false noncompliance finding designed to thwart KCA's refinance efforts and further disrupt the school's cash flow.

85. On information and belief, in or about December 2012, KCA's single audit report was sent by the Local Government Commission to Defendant Bruton at DPI for their routine review and the report showed the school had achieved an approximate $49,000 positive operating fund balance.

86. Defendant Bruton engaged in conduct design to delay final approval of KCA's year ending June 30, 2012 audit report by the Local Government Commission, fraudulently claimed non-compliance, and thwarted KCA's refinance efforts.

87. In or about December 2012, Defendant Bruton issued a false financial noncompliance finding claiming that KCA had an approximate $285,000 questioned cost for allegedly illegally using State funds to pay its mortgage on its facilities the school used to operate as a public charter school.

88. Defendant Hall requested immediate correction of the false noncompliance finding issued by Defendant Bruton but DPI officials engaged in a pattern of delay for several months.

89. Defendant Bruton knew the applicable State law, had not made the same misinterpretation before or since, and intentionally, maliciously, and corruptly promoted the erroneous interpretation for the purpose of furthering the conspiracy.

90. Defendants Schauss and Bruton's actions were calculated to retaliate against Plaintiff Hall, force KCA into noncompliance, attempt to close the school, and destroy Plaintiff Hall's good name and reputation.

-15-

91. In March 2013, Defendants Schauss and Bruton sought to engage the North Carolina State of Education to revoke KCA's charter for failing to make certain payments to the State Health Plan and State Retirement System while the Division of School Business had improperly withheld about $600,000 in State Public School Funds from KCA and Defendants worked aggressively to thwart KCA from refinancing its facilities.

92. In March 2013, the North Carolina State Board of Education declined to revoke KCA's charter and noted KCA's $49,000 positive operating fund balance at the close of the 2011-2012 school year.

93. In or about March 2013, Defendant Schauss issued a memo which Defendant Hall did not receive until April 2013 which acknowledged that KCA could use State funds to pay it mortgage, but the memo failed to adequately address the specific facts needed to support KCA's refinance efforts by clearly acknowledging Defendant Burtons prior non-compliance finding was erroneous.

94. In or about March 2013, Defendant Bruton changed his erroneous noncompliance finding to eliminate the approximate $285,000 questioned cost but further attempted to disparage KCA.

95. By the time Defendant Bruton's false noncompliance finding and erroneous approximate $285,000 questioned cost was corrected it had already been effective in thwarting KCA's refinance efforts and placed KCA in a financial crisis for the 2012-2013 school year.

96. Certain officials and employee within the state agency mandated by law to operate the charter school program actively worked to destroy KCA and, on information and belief, maliciously targeted other charter school with racial animus.

-16-

97. In January 2013, Defendant Schauss requested that KCA provide her a copy of the school's budget for the remainder of the school year and a preliminary budget for the 2013-2014 school year.

98. The budget for the remainder of the 2012-2013 school year submitted by KCA showed that KCA needed to raise funds or borrow funds, in the amount of $200,000 to get through the school year and this was well known to Defendant Schauss.

99. In or about March 2013, KCA's board authorized Plaintiff Hall to borrow funds, as reflected in the KCA Board's minutes, to get KCA through the remainder of the school year and take other measures to get the school through the end of the school year while attempting to secure refinancing of the school's facilities as originally planned.

100. KCA made two $100,000 loans that were due and payable in July 2013 consistent with the KCA board's mandate and approval.

101. The 2012-2013 school year ended with KCA board reviewing the school's status and voting to move forward to the 2013-2014 school year and continue to work to refinance the school's facilities.

102. As of June 2013, KCA had an appraisal commissioned by the USDA dated 2011 that valued KCA's real estate at $4 million while about $2 million in debt was outstanding to USDA and Self-Help Ventures Fund.

103. As of August 2013, KCA had a pre-approval of eligibility for a $3 million refinance loan which would have paid off USDA and Self-Help Ventures Fund and netted KCA approximately $1 million for facilities repairs and future operating funds.

-17-

104. On information and belief, Defendants Schauss and Bruton continually misrepresented KCA's financial condition within DPI to facilitate support for closure within DPI.

105. In or about July 2013, KCA received an initial allotment of approximately $666,000 in State Public School Funds based upon its student enrollment goal of 366 students for the 2013-2014 school year which was 34 percent of the pre-adjustment annual allotment.

106. In the North Carolina charter school application process proposed schools are required to complete "Breakeven Analysis" as a contingency for it they do not meet their enrollment goals.

107. In the 2013-2014 school year KCA completed a "Breakeven Analysis" that set 235 students as the breakeven margin for the 2013-2014 school year student enrollment.

108. Student enrollment goals set in the spring are not deemed as request for funds and the state's allotment planning system provides the state with the ability to adjust the allotment based upon the actual student enrollment in the first 20-day count.

109. The Student Accounting policy manual provides that public charter school students in North Carolina are not officially enrolled in membership in any North Carolina public school until they attend in person.

110. On or about August 22, 2013, KCA received a letter dated August 16, 2013 from the Office of Charter Schools stating that KCA was placed on the North Carolina State Board of Education public agenda for its September 4, 2013 public board meeting with the Office of Charter Schools and Division of School Business requesting that the State Board revoke the school's charter.

-18-

111. On information and belief, the timing of DPI's revocation request at the start of the school year was designed to have the maximum adverse impact on student enrollment during the critical first 20-day average daily membership count.

112. The August 16, 2013, letter did not contain any materially new findings that were not known by Defendants as of June 30, 2013, at the close of the school year.

113. The Office of Charter School's sent a second letter outlining additional items to support its revocation request (which, on information and belief, were subsequently found to be erroneous).

114. KCA administration and staff immediately notified parents of the school status and the DPI attempt at revocation.

115. On information and belief, DPI's actions in seeking revocation at the start of the school year had an immediate adverse impact on student enrollment and the school experienced an immediate, unprecedented, and dramatic decline in student enrollment.

116. On or about September 4, 2013, KCA board of directors held an emergency meeting and voted to surrender the school's charter to the State Board of Education in light of the level of disruption and continuous attempts to thwart KCA's survival by Department of Public Instruction officials.

117. On or about September 4, 2013, the State Board voted to accept the surrender of KCA's charter after Plaintiff Hall had a telephone conference with DPI officials, including Defendant Schauss.

118. On or about 10 September 2013, a closeout monitoring visit from DPI was scheduled at KCA's offices in Lenoir County with DPI's Candi Honeycut for "Program" and Defendant Kerr for "Financial."

119. At the September 10, 2013 closeout monitoring visit Candi Honeycut was well organized, had a list of items to review, and the Program monitoring went smooth.

120. At the September 10, 2013 closeout a representative from the Office of the Governor for "Race-to-the-Top" cleared false allegations by DPI regarding KCA's operation of the "Race-to-the-Top" program.

121. At the September 10, 2013 closeout monitoring visit Defendant Kerr was not organized, did not provide KCA a list of review items, had no agenda, demanded to randomly go through file cabinets, was belligerent, hostile, and made racial slurs, i.e. stating "you people" directed at Plaintiff Hall.

122. At the September 10, 2013 closeout monitoring visit Defendant Kerr appeared to seek to intentionally provoke conflict and was intentionally condescending to her African American assistant in Plaintiff Hall's presences.

123. At the September 10, 2013 closeout monitoring visit Defendant Kerr's words, demeanor, tone, and projection demonstrated racial animus toward Plaintiff Hall and appeared designed and intended to threaten and intimidate.

124. Plaintiff Hall has attached to this Complaint and hereby incorporates by this reference **Exhibit(s) 1-5** as if full set forth herein.

### STATE AUDITOR INVESTIGATION

125. On or about 10 September 2013, Defendant Kerr informed Plaintiff Hall that she formerly worked for the Office of State Auditor, had significant personal contacts at the Office of State Auditor, and will make sure that the Office of State Auditor will place Plaintiff Hall in a "living hell" for years to come.

-20-

126.     On information and belief, Defendant Kerr previously worked for the Office of State Auditor for approximately 11 years and 9 months with 6 years as an investigative auditor.

127.     Subsequent to the September 10, 2012 visit by Defendant Kerr, Kerr's immediate supervisor and co-conspirator, Defendant Schauss submitted a written document to the Office of State Auditor wherein Defendant Schauss stated "I believe that due to the above financial information and the history of KCA and specifically Ozie Hall's delinquency in financial management, an audit by your office is merited."

128.     Defendant Schauss knew her written document to the Office of State Auditor to support an investigation consisted of items known by Defendants to be legitimate expenditures that Defendants maliciously intended to create a false pretext to initiate an audit by the Office of State Auditor and use Defendant Kerr contacts within the Office of State Auditor and knowledge of investigative auditing to improperly cast dispersion upon Plaintiff Hall's character, and corruptly influence the outcome of the audit.

129.     Defendant Schauss and the Division of School Business subsequently communicated to the Office of State Auditor falsely suggesting that checks from KCA were improperly written to repay loans totaling $230,000.00 which included interest and fees when Schauss knew of the loans in advance and had no reasonable basis to believe they were anything other than legitimate and consistent with the applicable law.

130.     Defendants even maliciously referred the loans to the State Bureau of Investigation, Department of Public Safety, and Lenoir County District Attorney seeking a criminal prosecution but were rejected after the State Bureau of Investigation and Department of

-21-

Public Safety reviewed the documents and evidence Defendants claimed support such a criminal investigation.

131. State law specifically allowed charter schools to take out and repay operational loans from state public school funds.

132. Defendant Hall was contacted by the Office of State Auditor, Defendant Bass and the Office of State Auditor made document requests to which Defendant Hall and KCA fully complied.

133. Defendant Hall fully informed Defendant Bass and the Office of State Auditor audit team about the impact of Defendant Schauss' unilateral policy change, Defendant Bruton's erroneous Financial Non-compliance finding, and other improper actions taken by N.C. Department of Public Instruction officials and employees which materially impacted KCA's closure.

134. The Office of State Auditor Report dated January 2015 did not indicate the Office of State Auditor investigated Defendant Hall's allegations of misconduct by Defendants Schauss and Bruton or their material impact on the closure of KCA.

135. Under North Carolina law, the Office of State Auditor is empowered to conduct audits for financial compliance, economy and efficiency, program results, or any one or more of these stated purposes.

136. The Office of State Auditor authority included the power to investigate and report on the impact of misconduct by State Officials and employees in the closure of KCA and said misconduct was material to the closure of KCA.

137. In or about October 2013, Plaintiff Hall received communications from State Auditor Investigator Amanda Hohl specifically requesting that Defendant Hall provide the

-22-

Office of State Auditor with an explanation of the basis of KCA's 2013-2014 student enrollment goal of 366 students.

138. On or about October 31, 2013, Defendant Hall sent a memorandum via email to Amanda Hohl and copied the same to Defendant Bass and other members of the State Audit team which provided an explanation and the basis of KCA's 366 student enrollment goal for the 2013-2014 school year. [**Exhibit 3: October 31, 2013 Memo to Amanda Hohl**].

139. In the final State Auditor Report dated January 2015, Defendant Bass caused the final report to falsely state that "The School provided no evidence supporting and estimated student attendance increase." [State Auditor Report, p. 6].

140. In a written brief in a proceeding before the North Carolina Supreme Court, the Office of the Attorney General, including Defendant Liles, argued that "This lack of evidence or methodology supporting Kinston Charter's estimate was key to the State's claim." (The State's New Response Brief, dated 25 January 2021, page 32).

141. Notwithstanding the claim made in the State Auditor Report by Defendant Bass that KCA provided no evidence supporting an estimated student attendance increase Defendant Bass admitted in a Deposition dated April 24, 2018 that Defendant Hall and KCA had in fact provided the Office of State Auditor a memorandum dated 31 October 2013 that provided the basis for the 366 student enrollment goal of 366 students for the 2013-2014 school year.

142. Defendant Bass claimed, under oath, to be a certified fraud examiner employed by the North Carolina Office of the State Auditor, that his title was Assistant State Auditor Manager, that he had "direct knowledge" of the facts, and that a true and accurate copy of the audit report is attached to the complaint as Exhibit 20 which contained the false

-23-

statement regarding whether Defendant Hall and KCA provided a basis for KCA's 366 student enrollment goal for the 2013-2014 school year.

143. Defendant Bass and the Office of State Auditor Report claimed that KCA has received multiple citations for "fiscal mismanagement" while the N.C. Department of Public Instruction never characterized any fiscal finding as "fiscal mismanagement" until the letter from Defendant Schauss seeking the state auditor audit.

144. Defendant Bass and the Office of State Auditor Report falsely characterized KCA's 366 student enrollment goal for the 2013-2014 school year as an "overstated attendance estimate."

145. Joel Medley, former Director of the Office of Charter School (and other DPI officials), in Depositions, testified under oath that they would not characterize the 366-student enrollment goal as "overstated."

146. Public data from the N.C. Department of Public Instruction show that many public charter and traditional school districts did not meet their student enrollment goals (before, during, and after the 2013-2014 school year), but on information and belief, none have been accused of [overstating] student enrollment or been subjected to an audit by the N.C. Office of State Auditor.

147. Defendant Bass and the State Auditor Report provided a document (State Audit Report) to the Governor, Attorney General, General Assembly, State Bureau of Investigation, and the District Attorney of Lenior County that made false and misleading characterizations including characterizations claiming alleged fiscal mismanagement, regarding the alleged hiring of relatives, and regarding alleged questionable payments to

-24-

support its recommendation that the State Board of Education pursue litigation against Defendant Hall and KCA, including criminal prosecution.

148. The State Board of Education and Department of Public Instruction and KCA made written responses to the State Auditor Report which were included in the public State Auditor Report.

149. KCA's Response to the State Auditor Report placed Defendant Liles on notice of the allegations of misconduct by Staff officials and employees.

150. The State Audit Report dated 28 January 2015 states that "The Office of the State Auditor received allegations from the North Carolina Department of Public Instruction (DPI)…[that] DPI suspected potential misspending of state and federal funds by the School's Chief Executive Officer/Principal" [State Auditor Report p. 1] but everything cited was clearly a pretext to abuse the powers of the Office of the State Auditor.

151. State Auditor investigators investigation did not find any illegal conduct and Defendant Bass joined the conspiracy to damage Plaintiff Hall's good name and reputation by making embellishments, false statements, and providing misinformation to support a malicious civil prosecution of Plaintiff Hall and to malign Plaintiff Hall's reputation and character.

152. On information and belief, Defendant Bass maliciously and corruptly, and acting outside of his authority, aided the Office of Attorney General create false information to support filing a lawsuit against Plaintiff Hall.

**ATTORNEY GENERAL INVESTIGATION**

153. The North Carolina False Claims Act required that the Attorney General diligently investigate claims under the North Carolina False Claims Act prior to filing an action.

-25-

154. On information and belief, Defendant Liles began interviewing Department of Public Instruction officials in 2014 about the facts surrounding KCA's closure, during which Defendant Liles interacted with the Office of the State Auditor that performed the audit of KCA, including Defendant Bass.

155. On information and belief, Defendant Liles interviewed DPI employees, collected documents from DPI and the OSA and held meetings with OSA officials about their investigation, findings, and the underlying facts supporting those findings.

156. On information and belief, during the course of investigation, and before filing the complaint, Defendant Liles reviewed Plaintiff Hall's 31 October 2013 memorandum to Audit Investigator Amanda Hohl and knew that Plaintiff Hall and KCA had in fact provided the Office of State Auditor a written memorandum explaining the basis of its 366-student enrollment goal for the 2013-2014 school year and knew that the statement claiming that no explanation was given that was written in the final audit report was false at the time Defendant Liles signed and filed the lawsuit against Plaintiff Hall.

157. On information and belief, Defendant Liles and/or someone from his office and Defendant Bass collaborated and conspired before the final audit report was released to put the false statement regarding an explanation for the 366-student enrollment goal in the final audit report.

158. On information and belief, Defendant Bass had a meeting of the minds with his co-conspirators and agreed that Defendant Bass would place a false statement, specifically that "The School provided no evidence supporting and estimated student attendance increase." (State Auditor Report, p. 6), in the final State Audit Report to create a false pretext for filing a North Carolina False Claims Act claim against Defendant Hall.

159. On information and belief, Defendant Liles interviewed DPI Officials and employees and determined during his investigation that initial student enrollment goals are not "claims for State funds."

160. On information and belief, Defendant Liles interviewed DPI Officials and employees and determined that student enrollment goals for the 2013-2014 school year could not be submitted verbally.

161. Defendant Liles alleged in the complaint that "On an April 26, 2013 call with DPI" Plaintiff Hall increased the school's projected enrollment for the next year to 366 students." (Compl. ¶¶ 31-32).

162. Knowing that claims could not be made orally, Defendant Liles falsely and maliciously claimed that the alleged April 26, 2013 call with DPI consisted of Plaintiff Hall making a false statement in making a claim for State funds.

163. Defendant Liles used the April 26, 2013 alleged call with DPI to create a knowingly false pretext to bring individual capacity claims against Plaintiff Hall in the subject civil action.

164. During the investigative stage, prior to filing the complaint, Defendant Liles determined that the reference to the alleged April 26, 2013 "call with DPI" made in the complaint specifically referenced meeting notes from Office of Charter School Consultant Dr. Lisa Swinson and that the same did not constitute a "claim for state funds" but maliciously intended to falsely use the alleged call as a basis to support an individual capacity claim against Defendant Hall under the North Carolina False Claims Act.

165. On information and belief, during the investigative stage, prior to filing the complaint, Defendant Liles collected sufficient data and information and concluded there

-27-

was no legitimate basis to file a complaint against Plaintiff Hall that was supported by fact and grounded in law.

166. On information and belief, Defendant Liles, during the investigation stage, was made aware of Plaintiff Hall's civil rights advocacy and joined the conspiracy to damage Plaintiff Hall's standing in the community and to maliciously violate Plaintiff Hall's Constitutional and civil rights.

167. Defendant Liles crafted arguments to file claims under the North Carolina Nonprofit Corporations Act, Chapter 55A and the Unfair and Deceptive Trade Practices Act that Defendant Liles knew or should have known were false and frivolous based upon his prior investigation.

168. Defendant Liles claimed that KCA and Plaintiff Hall violated the N.C. Unfair and Deceptive Trade Practices Act and deceived and mislead students and their parents without having a factual basis for Defendant Liles' conclusory claim.

169. Defendant Liles attempted to argue that KCAs' board of directors acted improperly or failed to provide oversight of Plaintiff Hall knowing the allegation to be false and having full knowledge that KCA board of directors held proper meetings and conducted business with a quorum present and acted in accordance with the law.

170. Defendant Liles conduct in filing and signing the complaint was done with actual malice, complete disregard for the reputations of Plaintiff Hall and each member of KCA's board of directors, and the lawsuit was filed for an illegal and improper purpose.

171. Defendant Liles crafted arguments to deflect the misconduct of Defendants Schauss, Kerr, and Bruton which Defendant Liles had discovered during the investigation

-28-

stage before filing the civil action against Plaintiff Hall and when Liles joined the conspiracy.

172. On information and belief, Defendant Liles reached a point in his investigation where he knew there was no basis to file a legal action against Plaintiff Hall but consciously decided to join the conspiracy and maliciously file based upon racial animus, motives of retaliation, and other improper and illegal reasons.

173. The trial court forthwith dismissed Defendant Liles claims under Chapter 55A North Carolina Nonprofit Corporations Act and the Unfair and Deceptive Trade Practices Act under Rule 12(b)(6) for failure to state a claim upon which can be granted.

174. There was no basis in law or fact to sustain Defendant Liles claims under Chapter 55A North Carolina Nonprofit Corporations Act and the Unfair and Deceptive Trade Practices Act and the claims were interposed by Defendant Liles for an improper purpose.

175. On information and belief, there was no basis in law or fact found during Defendant Liles investigation to support a claim under the North Carolina False Claims Act, so Defendants Liles and Bass conspired together along with Defendants Schauss, Kerr, and Bruton to falsely claim that KCA and Plaintiff Hall did not provide a basis of support for its 366-student enrollment goal.

176. On information and belief, Defendant Schauss, Kerr, and Bruton reviewed the draft State Auditor Report before it became final and did not make any objection to information contained in the document that they knew to be false and misleading despite an obligation to do so.

177. In reliance upon Defendants Liles and Bass false statements that KCA and Plaintiff Hall did not provide a basis for the 366-student enrollment goal the trial court was duped

-29-

into accepting *Harrison v. Westinghouse Savannah River Co., 176 F.3d 776 (4th Cir. 1999)* as good authority for the proposition that the N.C. False Claims Act claim was viable on a "promissory fraud" theory.

178. The trial court accepted that false statements made by Defendants Liles and Bass in the complaint and in the audit report as true for purposes of Plaintiff Hall's motion to dismiss under *Rule 12(b)(6)* and did not dismiss the claim on Plaintiff Hall's Rule 12(b)(6) motion to dismiss for failure to state a claim.

179. Plaintiff Hall made multiple requests to Defendant Liles to dismiss the complaint, but Defendant Liles refused, and the litigation continued from April 26, 2016 until June 10, 2022 when Assistant Attorney General Kunal J. Choksi filed a voluntary dismissal under Rule 41. [**Exhibit 4: Notice of Dismissal, dated June 10, 2022**]

180. Plaintiff Hall was not a party to any settlement agreements, made it perfectly clear that Plaintiff Hall intended to sue for malicious prosecution, and Assistant Attorney General Choksi unilaterally dismissed the lawsuit against Plaintiff Hall, deemed terminated in Plaintiff Hall's favor as a matter of law.

181. Plaintiff Hall represented himself *pro se* in the trial court on the individual capacity claims against him, and all official capacity claims were dismissed by the trial court on motions prior to the final voluntary dismissal by Mr. Choksi.

## CHARTER SCHOOL STUDENT ENROLLMENT

182. Effective for the 2013-2014 school year, the State of North Carolina did not have any requirements for evidence or methodology in State law, State Rules, State Policy, or State Procedures for setting student enrollment goals in public charter schools beyond those

built into State's calculations provided to each charter school upon which KCA and Plaintiff Hall relied.

183. The North Carolina State Board of Education characterized the statutorily authorized 20 percent growth as "Normal Growth" in its 2013-2014 Report to the North Carolina General Assembly.

184. Effective for the 2013-2014 school year, North Carolina General Statutes that provided for student enrollment growth not exceeding 20 percent of prior year enrollment in public charter schools, did not require State Board approval and allowed public charter schools to set student enrollment goals based upon what state public policy deemed "Normal Growth" as codified in the relevant statute.

185. Dr. Joel Medley, who served as Director of the Office of Charter Schools prior to and during the 2013-2014 school year testified under oath in a Deposition that public charter schools were routinely automatically given their first State Funds allotment based upon the maximum allowable enrollment permitted without State Board approval.

186. KCA Board of Directors approved and authorized the 2013-2014 student enrollment growth goal of 366 students and adopted an annual budget for the same.

187. KCA's 2013-2014 student enrollment goal was not unreasonable and was deemed "Normal Growth" within the definition used by the State Board of Education in its annual report to the North Carolina General Assembly.

188. When the Allotments Section of the N.C. Department of Public Instruction sets a public charter school's maximum enrollment growth, it does so based upon the charter school's prior years enrollment.

-31-

189. Under State law North Carolina public charter schools are entitled by law to receive, drawl down, and expend its initial allotment and KCA did so in the 2013-2014 school year and did so without there being any unallowable expenditures as a matter of law.

190. In the 2013-2014 school year, about 80% of a total of approximately 149 North Carolina public charter schools' student enrollment goals exceeded their actual enrollment, but the State Attorney General through Defendant Liles did not and has not sued any of them or their administrators under the North Carolina False Claims Act.

191. Each year, for the past 20 years, as many as 80% of North Carolina public charter schools student enrollment goals exceeded their actual student enrollment but have never been sued by the State Attorney General under the North Carolina False Claims Act.

192. On information and belief, setting student enrollment goals does not constitute a "claim for State funds" as contemplated in the North Carolina False Claims Act and Defendant Liles knew the accusations against Plaintiff Hall were unprecedented.

193. Defendants Liles and Bass acknowledge that when KCA set its student enrollment goal for the 2013-2014 school year, KCA had a facility that could hold more than 366 students, engaged in marketing to increase student enrollment, purchased additional buses, and took specific measures to accommodate the enrollment growth to 366 students.

194. North Carolina public charter schools are allowed by law to draw students from any county in the State and there were at least 40,000 students eligible to attend KCA within a reasonable transportation radius.

195. KCA sought to enroll less than 1% of eligible students within a reasonable transportation radius for the 2013-2014 school year, including students already enrolled from the prior school year.

196. On information and belief, Defendant Liles and Bass, during the investigation stage determined that KCA 366 student enrollment goal for the 2013-2014 school year was reasonable and achievable but determined they would make false statements to maliciously pursue a prosecution of Plaintiff Hall.

## DEFENDANTS CAPACITY TO DISCRIMINATE

197. The North Carolina Charter School Act required North Carolina public charter schools to meet the State's audit requirements, comply with State Board of Education policy regarding financial matters, and exempted charter schools from other State laws and rules not stated in the State's charter school law.

198. The North Carolina State Board of Education adopt few substantive policies or procedures except that charter schools were required to participate in the Uniform Educational Reporting System (UERS).

199. The North Carolina State Board of Education adopted Policy ID No. CHTR-006 titled "Charter Schools Financial and Governance Noncompliance" which provides three levels of financial noncompliance, including "Cautionary," "Probationary," and "Disciplinary."

200. Until 2021, independent audits of charter schools in North Carolina were required to be submitted and approved by the N.C. Department of Treasury, Local Government Commission.

-33-

201.     The Local Government Commission opined that North Carolina charter schools are not subject to the State's "Balanced Budget Act" and therefore were not required to eliminate a cumulative deficit in any single year.

202.     The State of North Carolina's lack of clear financial policies and procedures for charter schools and subjective nature of existing policy resulted in uneven enforcement and enabled N.C. Department of Public Instruction officials and employee's broad discretion and the ability to unilaterally practice raced-based discrimination against certain public charter schools and individuals.

203.     The N.C. Department of Public Instruction recognized a distinction between the nonprofit corporation running the charter school and the charter school itself until the Local Government Commission issued Policy Memorandum #2019-10 on May 15, 2019 which required audits be completed for the entire nonprofit entity holding the charter as opposed to just the charter school itself.

204.     After the Local Government Commission's Policy Memorandum #2019-10 was issued the Legislature subsequently removed the audit review function from the Local Government Commission and placed it in the N.C. Department of Public Instruction without substantive requirements like the Local Government Commission's Policy Memorandum #2019-10.

205.     On information and belief, under the system in place from 2007 through 2013 when Kinston Charter Academy operated, N.C. Department of Public Instruction officials and employees, including Defendants Schauss and Bruton, and the Local Government Commission allowed certain "white flight" charter schools to paper over deficits and

otherwise hide conduct that was inconsistent with Generally Accepted Accounting Procedures (GAAP) to avoid sanctions under State Board Policy CHTR-006.

206. On information and belief, it was and is widely known in the charter school community that DPI and particularly Defendant Schauss routinely practices discrimination against Blacks and overlooks noncompliance by racially identifiable white flight charter schools.

207. Defendants Schauss and Bruton did not acknowledge that Kinston Charter Academy real estate showed phantom asset deficits due to state accounting policies and Defendants used the erroneous policy as a basis to claim the school showed signs of financial weakness even though said Defendants knew that Kinston Charter Academy owned real estate appraised at $4 million with about $2 million in debt and thus had substantial equity stored in its real estate.

208. On information and belief, Defendants Liles, Bass, Schauss, Kerr, and Bruton selectively used the State's lack of substantive financial policies to target KCA and Plaintiff Hall on the basis of race and treated Plaintiff Hall differently than any other similarly situated person within the state.

209. Early in the State's development of the charter school program State law allowed the State Board of Education to establish a Charter School Advisory Board to advise, make recommendations, and the support the State Board of Education in administration of the State's charter school program.

210. Prior to certain DPI officials attacks on "Black" charter schools, the State Board had established an active Charter School Advisory Board which review DPI officials regarding charter schools and made recommendations to the State Board.

Case 5:23-cv-00220-BO-BM    Document 1    Filed 04/24/23    Page 35 of 62

211.     On information and belief, the Charter School Advisory Board was terminated prior to certain attacks on "Black" charter schools and particularly the attacks on KCA.

212.     The absence of the charter school advisory board allow Defendants Schauss and Bruton to engage in misconduct against a charter school without oversight.

## DEFENDANTS ATTACK ON KCA AND HALL

## RELATES TO PCCEBC UNITARY STATUS CASE

213.     The North Carolina State Board of Education and the N.C. Department of Public Instruction are constitutionally mandated to "supervise and administer" the public school system of the State of North Carolina.

214.     Pitt County School District to the "supervise and administer" provides of the North Carolina Constitution and the Pitt County School District was in fact a public school regulated and provided oversight by Defendant Schauss.

215.     Plaintiff Hall served as the founder and President of the Pitt County Coalition for Educating Black Children (PCCEBC) and was known to the SBE, DPI, Division of School Business, and the Attorney General as a civil rights activist.

216.     PCCEBC was the Plaintiff representative group in the "unitary status" case known as *Everett, et al v. The Pitt County Board of Education*, scheduled for trial in the U.S. District Court for the Eastern District of North Carolina for October 2013.

217.     Friendly DPI staff, from time to time, made various cautionary comments to Plaintiff Hall indicating their awareness regarding Plaintiff Hall's civil rights activism, participation in litigation against Pitt County Schools, participation in OCS complaint against the SBE, DPI, and OCS and the internal discussions and hostilities by some SBE and DPI officials.

-36-

218. Defendants Schauss, Kerr, and Bruton's misconduct created a way to cast a shadow upon Plaintiff Hall in the public eye and overshadow Plaintiff Hall's good character with baseless accusations prior to the "unitary status" trial scheduled for October 2013.

219. On information and belief, Defendants Schauss and Kerr make misinformation statements to press regarding Plaintiff Hall and KCA prior to the October 2013 unitary status trial to disparage Plaintiff Hall's character and overshadow Plaintiff Hall's civil rights work.

### ANDERSON CREEK CLUB CHARTER SCHOOL

220. Plaintiff Hall served as a founding member of the board of directors of Anderson Creek Club Charter School (aka: Anderson Creek Academy), wrote the charter application, and had a meeting of the minds with Anderson Creek Club Developers to partner in the creation of a charter school management company to subsequently open a middle and high school and other public charter schools with the Developer's financial backing.

221. Anderson Creek Club Developers invested several millions of dollars in developing facilities for Anderson Creek Club Charter School in reliance upon Plaintiff Hall's management skills related to public charter schools after their careful investigation.

222. On information and belief, after KCA Board of Directors surrendered its charter and before any State Audit Report was issued, Joel Medley contacted Developer David Levinson to disparage Plaintiff Hall and suggest that Plaintiff Hall not be allowed to serve on Anderson Creek Club Charter School's (ACCCS) Board of Directors.

223. On information and belief, Office of Charter School Consultant Thomas Miller, in a meeting at DPI pulled ACCCS Board Member John Werderman aside to disparage Plaintiff Hall.

-37-

224. Attorney General Roy Cooper, while running for Governor of North Carolina, visited ACCCS with Levinson, solicited and obtained campaign contributions from Levinson, and reportedly disparaged Plaintiff Hall.

225. On information and belief, ACCCS Board members read the State Auditor Report when it was released in January 2015, including DPI and KCA's response and rejected the innuendo that Plaintiff Hall had acted improper after their own investigation.

226. ACCCS hired Plaintiff Hall as the school's Principal and Lead Administrator under a written contract.

227. Defendant Liles filed the lawsuit against Plaintiff Hall on April 26, 2016, accompanied by press release.

228. A group of ACCCS parents, after hearing the press reports, contacted ACCCS Board Members to raise concerns about entrusting ACCCS to Plaintiff Hall as Principal and Lead Administrator. [**Exhibit 5: Affidavits of ACCCS Parents**].

229. The false accusations of fraud against Plaintiff Hall by Defendants went worldwide through the Internet and the press.

230. Plaintiff Hall's employment was terminated by ACCCS Board of Directors and subsequent plans for the management company partnership were scrapped resulting in millions of dollars in loss to Plaintiff Hall proximately caused by Defendants conspiracy and malicious prosecution.

231. Plaintiff Hall sued ACCCS, including for extreme emotional distress, and made a partial recovery of damages but sustained major losses, including financial losses, loss of future business opportunities, and permanent damage to Plaintiff Hall's reputation and standing in the community.

-38-

232.     Defendant Liles lawsuit had a substantial adverse impact upon Plaintiff Hall, his wife, and his children including those who attended ACCCS.

233.     Defendant Liles filing the lawsuit caused Plaintiff Hall and his family to experience foreseeable extreme emotional distress.

## KCA's ACADEMIC STANDING

234.     KCA made expected academic growth or high growth under the State's ABC Accountability System each year that it operated except for the 2011-2012 school year when KCA did not make expected academic growth.

235.     In the 2011-2012 academic school year KCA was required to hire a vendor from DPI's list of approved Supplemental Educational Services (SES) Vendors and KCA hired Sylvan Learning Center owned by Rebecca Taylor.

236.     KCA had a collaboration with East Carolina University student groups to provide student tutoring and the school experience academic growth when these ECU students provided the tutoring services.

237.     In the 2011-2012 academic school year KCA used Rebecca Taylor's company, Sylvan Learning, the school did not make academic growth.

238.     Rebecca Taylor was subsequently appointed to the State Board of Education and took an adversarial position against Plaintiff Hall and KCA.

239.     In the 2013-2014 school year, Joel Medley (Director of the Office of Charter Schools) erroneously forecast that KCA would have to close because it did not make academic growth for the 2012-2013 school year (official results would come out in October 2013) and would be closed under that State law and State Board policy for which Plaintiff

-39-

Hall and the Association for African American Charter School Administrators filed the U.S. Department of Education, Office of Civil Rights Complaint in 2010.

240. Plaintiff Hall's internal academic growth calculations indicated that KCA likely did make expected growth and that Medley was providing incorrect information.

241. On information and belief, Defendants Schauss and Bruton conducted a misinformation campaign within DPI and attempted to cause DPI staff to become hostile toward KCA and Plaintiff Hall and unwittingly support Defendants Schauss and Bruton's unlawful conspiracy.

242. KCA did in fact make academic growth in the 2012-2013 academic school year.

243. On information and belief, Joel Medley, after leaving the Office of Charter Schools became the Director of a North Carolina virtual charter school which subsequently did not make academic growth for two years out of three, but the State changed the law to keep Medley's school from closing.

### DEFENDANTS RACE CONSCIOUS MISCONDUCT

244. On information and belief, before and during the 2013-2014 school year, there were about 149 North Carolina public charter schools including White racially identifiable schools and Black racially identifiable schools.

245. On information and belief, racial animus by Defendant Schauss and Bruton and a culture of racial animus at DPI resulted in a pattern of closures of racially identifiable black charter schools and the unilateral disbanding of the statutorily allowed Charter School Advisory Board in favor giving DPI staff including Defendants Schauss and Bruton the unilateral authority to practice discrimination unchecked.

-40-

246. On information and belief, at the time DPI moved to revoke KCA's charter, the statutorily allowed Charter School Advisory Board had been unilaterally disbanded and there was no entity to stop or mitigate Defendant Schauss and Bruton's misconduct.

247. On information and belief, DPI and Defendants Schauss and Bruton placed under scrutiny and took enforcement actions disproportionately against racially identifiable black schools and overlooked errors of racially identifiable white schools as a matter of course.

248. Defendants Schauss and Bruton used their positions as State officials and employees to selectively target racially identifiable Black charter schools.

249. On information and belief, Division of School Business established a "watch list" of targeted schools primarily based upon race.

250. The 30 or more charter schools whose charters were revoked or surrendered under pressure by state officials as of the 2013-2014 school year, were disproportionately administered by non-white administrators and disproportionately served non-white students.

251. Plaintiff Hall was treated differently because of his race and as retaliation for exercising Plaintiff Hall's First Amendment Constitutional Rights.

252. On information and belief, the North Carolina State Board of Education and N.C. Department of Public Instruction have historically operated with a culture of raced-based discriminatory conduct.

253. On information and belief, the 100-charter school's cap created pressure on certain white DPI staff to eliminate Black racially identifiable charter schools to make way for white flight schools unless the Black schools were connected to unofficially approved white vendors such as Acadia Northstar, LLC.

-41-

254.    On information and belief, Defendants supported White flight charter schools by focusing regulation enforcement on racially identifiable Black charter schools and overlooked noncompliance by racially identifiable White charter schools.

255.    The State's official rules and regulations regarding charter school financial operations in North Carolina were extremely limited or non-existent to the extent it allowed Defendants Schauss and Bruton to practice raced-based discrimination with impunity and unfairly target racially identifiable Black charter schools.

256.    On information and belief, Defendants Schauss and Bruton were aware of Plaintiff Hall's civil rights work and advocacy on behalf of Black children, including the Pitt County case and OCR Complaint against SBE, DPI, and OCS and sought to retaliate based upon racial animus and a desire to disparage Plaintiff Hall before the October 2013 unitary status trial in the U.S. District Court for the Eastern District of North Carolina.

257.    Defendants Schauss, Kerr, and Bruton had a meeting of the minds and engaged in a conspiracy to discredit Plaintiff Hall and shut-down KCA motivated *inter alia* by racial animus and consistent with the culture of the SBE and DPI.

258.    Each year hundreds of charter schools and district school do not meet their enrollment goals but have not been publicly accused of fraud like Plaintiff Hall.

259.    Defendants Schauss, Kerr, Bruton, Bass, and Liles committed overt acts in furtherance of the conspiracy against Plaintiff Hall were motivated *inter alia* by racial animus and retaliation for Plaintiff Hall exercise of First Amendment rights.

260.    Defendant Bruton's erroneous noncompliance findings and approximate $285,000 questioned cost was targeted at Plaintiff Hall based upon race and Plaintiff Hall's exercise

-42-

Case 5:23-cv-00220-BO-BM    Document 1    Filed 04/24/23    Page 42 of 62

of constitutional and civil rights and Plaintiff Hall was thereby treated differently than similarly situated White charter school administrators.

## DEFENDANTS MALICIOUS PROSECUTION

261. On or about June 10, 2022, the new legal counsel assigned to State v. KCA by the North Carolina Attorney General filed a unilateral Notice of Dismissal under Rule 41 with the Wake County Superior Court terminating the case in Plaintiff Hall's favor. [**Exhibit 4**].

262. The trial court previously dismissed individual capacity claims under Chapter 55A Nonprofits Corporations Act and the Unfair and Deceptive Trade Practices Act against Plaintiff Hall, and all official capacity claims against Plaintiff Hall on motions to dismiss made under *N.C. Gen. Stat. 1A-1, Rule 12(b)(6)* for failure to state a claim upon which relief can be granted.

263. Plaintiff Hall made multiple written requests to Defendant Liles to voluntarily dismiss the North Carolina False Claims Act claim against Plaintiff Hall both before and after Defendant Bass admission during Deposition.

264. There was no basis in law or fact to file the lawsuit against Plaintiff Hall and Defendant Liles was able to maintain the lawsuit for as long as he did based upon the sentence in the State Auditor Report to which he had clear evidence and he knew was a statement false.

265. Defendants lacked probable cause to file the lawsuit styled State v. KCA and especially with Plaintiff Hall being sued in his individual capacity.

266. Defendants caused the lawsuit to be filed and maintained *inter alia* based on racial animus, as retaliation for Plaintiff Hall exercising his First Amendment rights, as retaliation

-43-

for Plaintiff Hall making complaints regarding misconduct by Defendant Bruton and the Division of School Business, and to silence Plaintiff Hall as a civil rights advocate.

267.     Defendants' conduct in filing the lawsuit against Plaintiff Hall was done willfully, corruptly, with malicious intent and actual malice, and based upon race.

268.     Plaintiff Hall suffered and continues to suffer special damages in excess of $25 million proximately caused by Defendants misconduct.

## DEFENDANTS LACK OF PROBABLE CAUSE

269.     On information and belief, Defendants Liles and/or someone from the Office of Attorney General and Bass collaborated to ensure the State Audit Report contained false and misleading information upon which Defendant Liles could rely in drafting and filing the complaint against Defendant Hall in his individual capacity.

270.     On information and belief, Defendants reviewed and approved the final draft of the complaint.

271.     The complaint erroneously purported that KCA had experienced declining student enrollment as a basis to support and Defendant Liles False Claims Act argument that the 366-student enrollment goal was "reckless and unreasonable" and ultimately false when Defendants knew the state process had already calculated prior year enrollment in determining normal growth.

272.     The Allotments Section of the Division of School Business relies on prior years enrollments as the benchmarks to calculate maximum student enrollments for an upcoming school year and thus any decline in student enrollment is already baked into the equation when the state provided Plaintiff Hall and KCA the very numbers it claimed were fraudulent.

-44-

273. The actual decline in enrollment between the 2011-2012 and 2012-2013 school years was 305 students to 302 students, an actual decline of 3 students.

274. Defendant Liles pre-filing investigation demonstrated that his reliance upon a declining enrollment theory to support his North Carolina False Claims Act claim against Defendant Hall would be misleading and a purposeful deception upon the trial court.

275. The State Audit Report did not squarely address the fact that KCA owned real property with an appraised value of $4 million dollars while having approximately only about $2 million in debt resulting in the school having about $2 million in equity that could be drawn in a refinance.

276. The State Audit Report did not squarely address the issue that even with as little as 75 percent loan to value KCA had the capacity to refinance its real property and net $1 million in cash to use in its future operations.

277. The State Audit Report did not address the fact that it was material to the audit report that misconduct on the part of Defendants Schauss, Kerr, and Bruton directly adversely impacted KCA refinance efforts.

278. Defendants Liles and Bass erroneously claimed that KCA's overstated student enrollment resulted in KCA receiving about $344,000 more than what it would have been entitled to receive when even if 189 was all the students that ultimately enrolled KCA would be entitled to approximately $1 million in state public school funds, not including federal and local fund, child nutrition funds, and other funds.

279. The State Audit Report's material omissions made it materially false.

280. KCA was in fact entitled by law to receive and expend its initial State Funds allotment based upon 34 percent of an annual allotment for 366 students and there was

-45-

nothing improper in KCA expending the entire amount of its initial allotment as a matter of law.

281.     At the time the school closed in September 2013, it is material that KCA had not receive its local or federal funds which Defendants Liles and Bass intentionally omitted to mislead the trial court.

282.     There was nothing improper in KCA expending its entire initial allotment by September and the failure to mention that KCA had not yet received Local and Federal funds is a material misrepresentation of the pertinent facts.

283.     Defendants Liles and Bass claimed that KCA had an ADM of only 189 students for the 2013-2014 school year but 189 was actually the attendance for a single day prior to the Labor Day weekend when attendance is traditionally low which contrast to DPI's report in their audit report response that KCA had 230 students when it officially closed in the official Power School Database.

284.     Even if 189 was KCA's actual ADM, which it was not, KCA would have been entitled to receive approximately $1 million in state public school funds alone for the 2013-2014 school year.

285.     With an ADM of 230, KCA was entitled to receive approximately $1.2 million in state funding alone, not including local and federal funds for its operations.

286.     KCA was within the margin of its breakeven analysis of 235 students and the school could have survived had it not been disrupted by DPI employee misconduct.

287.     On or about September 4, 2013, prior to KCA Board of Directors final resolution to surrender KCA's charter, Plaintiff Hall had a telephone conference with Defendant

Schauss and other DPI officials wherein the implications of surrendering the KCA charter prior to the close of the first 20-day count was discussed.

288. During the September 4, 2013 telephone conference between Plaintiff Hall and Defendant Schauss, Plaintiff Hall was assured that if KCA surrender the charter there would be no adverse consequences of surrendering prior to the first 20 day count and the same would be in the best interest of students and receiving schools.

289. Defendants subsequently reneged on its representation made to Plaintiff Hall in September 4, 2013 telephone conference with Defendant Schauss and other DPI officials.

290. Defendants claim that DPI did not know that KCA took out loans in the 2012-2013 school year was false and the record shows that KCA provide Defendant Schauss a closeout budget for the 2012-2013 school year in January 2013 that showed the school needed to raise $200,000.00 to complete the school year and the loans were disclosed to Defendant Schauss.

291. Defendant Schauss had numerous subsequent communications with Plaintiff Hall after the January 2013 closeout budget which placed Defendants on notice that $200,000 was being borrowed and would have to be repaid.

292. KCA's repayment of the two $100,000 operations loans was authorized by North Carolina General Statutes and Defendants Liles characterizations of the loans in the complaint were misleading and a willful and malicious attempt at deception on the trial court.

293. Defendants falsely claimed that Defendant Hall improperly paid himself approximately $11,000, which was earned vacation pay and was authorized under N.C.

General Statutes but failed to point out that Defendant Hall was entitled to the funds and did not sign the check authorizing the payment.

294.     Defendants falsely and misleadingly claimed that Defendant Hall improperly received a vacation payout while $370,000 in payroll obligations was owed.

295.     Defendants falsely claimed that KCA improperly hired Plaintiff Hall's allegedly unqualified relatives but failed to point out that KCA Board of Directors vetted and hired the individuals in compliance with the law that Defendants erroneously questioned.

296.     Defendants failed to note the well-known familial relationships in racially identifiable White charter schools and attempted to present the issue in a false light to disparage Plaintiff Hall.

297.     Defendants falsely claimed that Plaintiff Hall and KCA knew or should have known that KCA would run out of money and not survive the school year and omitted evidence which showed that KCA would have survived but for interference and sabotage by Defendants Schauss and Bruton and DPI's targeted attempt to thwart KCA's 2013-2014 student enrollment.

298.     Defendant Liles falsely claimed that KCA's 366 student enrollment goal was unattainable.

299.     Defendant Liles falsely claimed that Plaintiff Hall made multiple reference to DPI officials in various conversations in the months leading up to KCA surrendering its charter that KCA would close by their failing to disclose the context, being Defendants Schauss and Bruton's improper efforts to thwart KCA's refinance efforts.

300.     Defendant Liles falsely implied in the complaint that KCA's Board of Directors was not discharging their duties and claimed there was a lack of Board Member

-48-

Case 5:23-cv-00220-BO-BM     Document 1     Filed 04/24/23     Page 48 of 62

participation but failed to note that all meetings had a quorum present and were properly conducted.

301. Defendants created a constellation of false statements, misleading innuendos, and hyperbole to cast dispersions upon Plaintiff Hall's character and maliciously suggest that Plaintiff Hall had engaged in misconduct and mismanagement when the same was not true.

302. Defendant Bass falsely attempted to discredit Plaintiff Hall's qualifications for being employed by KCA as the school's CEO/Principal.

303. Defendants jointly worked together in an attempt to use false information to discredit Plaintiff Hall.

## DEFENDANTS CONSPIRACY

304. The Division of School Business within the N.C. Department of Public Instruction was the primary interface between KCA and the State on the issue of KCA's financial operations.

305. The Division of School Business includes the Allotments Section, Cash Management section, and other sections that directly interacted with charter schools in the years leading up to and including the year KCA closed (September 2013).

306. Defendants Schauss and Bruton were directly involved with the financial operations of KCA for at least three years prior to the school's closure in September 2013.

307. Defendants Schauss and Bruton were intimately familiar with the specific financial operational details of KCA in the three years preceding its closure in September 2013.

308. Defendants Schauss and Bruton placed KCA on a watch list seeking to find anything they could use to seek to close KCA and discredit Plaintiff Hall after Plaintiff

-49-

Hall's complaint regarding Defendant Bruton's misconduct and Plaintiff Hall's involvement in filing an Office of Civil Rights complaint.

309. Defendants Schauss, Kerr, and Bruton had a meeting of the minds to shut down KCA and discredit Plaintiff Hall using false information and based upon both motives of retaliation motives and racial animus.

310. In 2012, it appeared to Defendants Schauss and Bruton that KCA had terminated its contract with Acadia Northstar, LLC, was postured to refinance its facilities, would likely net $1 million in cash for future operations from the refinance, and would likely obtain at least a 5-year charter renewal in 2013-2014.

311. Defendants Schauss and Bruton devised a common illegal scheme to shut down KCA, discredit Plaintiff Hall, and otherwise violate Plaintiff Hall's constitutional and civil rights.

312. Defendants Kerr, Bass, and Liles subsequently assented to the common scheme started by Defendants Schauss and Bruton.

313. Defendants common scheme informed by their operational knowledge of KCA consisted of willfully, intentionally, corruptly, and maliciously disrupting KCA's cash flow, creating a false financial noncompliance and questioned cost, and starting an internal misinformation campaign within the N.C. Department of Public Instruction to discredit Plaintiff Hall and seek KCA's charter revocation.

314. Defendants Schauss, Kerr, and Bruton subsequently recruited Defendants Bass and Liles to participate in the common scheme.

315. Defendants knew that KCA had achieved a positive fund balance for the year ending June 30, 2012 and would be seeking to refinance its real property.

316. Defendants became intimately familiar with KCA's financial plans over the prior three years based upon reviewing its records, monitoring KCA's finances, and having multiple information meetings with Plaintiff Hall.

317. In October 2012, Defendant Schauss made the first overt act of the conspiracy by unilaterally issuing an unauthorized policy change on cash advances specifically targeting KCA timed to preclude KCA's ability to timely obtain alternative financing.

318. Defendant Schauss's policy memo was dated September 5, 2012 but was not received by Plaintiff Hall until October.

319. The purpose of Defendant Schauss's unilateral policy change was to deny KCA access to cash which Defendants knew would disrupt the school's cash flow and make it unable to timely pay certain expenses which the Division of School Business could falsely claim was noncompliance.

320. In or about December 2012 Defendant Bruton committed the second overt act of the conspiracy by issuing a fraudulent financial noncompliance with a fraudulent questioned cost of approximately $285,000 intended to sabotage KCA's efforts at refinancing.

321. Defendant Bruton's fraudulent financial noncompliance and questioned cost were designed to thwart KCA ability to refinance its facilities and draw cash equity for operations.

322. Plaintiff Hall was first informed about the Bruton noncompliance document by a KCA creditor employee from Self-Help Ventures Fund, Ozlem Tanik.

323. Plaintiff Hall contacted DPI's chief financial officer who reportedly informed his staff that Defendant Bruton's finding was erroneous but relied upon his staff, including Defendant Schauss to correct the issue which they fail to time do.

324. It took about four months for the erroneous non-compliance to be changed but no one at DPI acknowledged the original non-compliance was incorrect or erroneous which left the issue unresolved with potential refinance lenders.

325. Defendant Schauss knew in January 2013 that KCA would borrow $200,000 to get through the school year based upon budget documents submitted and conversations with Plaintiff Hall.

326. Defendant Schauss knew the $200,000 loan was for KCA operations and was allowable to be repaid from State funds under N.C. General Statutes.

327. In August 2013, just days before the start of school Defendant Schauss participated in and promoted an effort to take KCA before the SBE to seek revocation of KCA's charter knowing said effort would impair KCA's ADM/Enrollment.

328. KCA's board of directors surrendered the charter on September 4, 2013.

329. On September 10, 2013, Defendant Kerr visited KCA, acted improperly, and made specific threats regarding directing misconduct by the Office of State Auditor.

330. Defendant Schauss cited the $200,000 loans as a basis for the Office of State Auditor audit even though she already knew they were legitimately paid from State funds.

331. On information and belief, Defendant Schauss and Kerr facilitated press reports maliciously and falsely accusing Plaintiff Hall of fraudulent conduct.

332. Defendants Schauss, Kerr, and Bruton maliciously pushed a false narrative that painted Plaintiff Hall as guilty of misconduct and fraud.

-52-

333. Defendant Bass subsequently joined the conspiracy after learning the truth by maliciously covering up Defendants Schauss, Kerr, and Bruton's misconduct, failing to properly address said misconduct and its impact on the closure of KCA in the State Auditor Report, and by actively making false and fraudulent statements in the Audit Report to support a conspiracy to maliciously prosecute Plaintiff Hall.

334. Defendant Liles joined the conspiracy by working with Defendants Bass and Schauss to create a false statement in the final State Auditor Report that could be used to create a false pretext of support for a N.C. False Claims Act claim against Plaintiff Hall and KCA.

335. The conspiracy began in 2012 with Defendants Schauss and Bruton, and was subsequently joined by Defendants Kerr, Bass, and Liles, and did not conclude until dismissal of State v. KCA on June 10, 2022.

## DEFENDANTS ABUSE OF PROCESS

336. Defendants' conspiracy to deprive Plaintiff Hall of his constitutional and civil rights culminated in Defendant Liles filing a civil complaint and having summons issued against Plaintiff Hall on or about April 26, 2016.

337. The complaint included *inter alia* a "Request for Preliminary Injunction" seeking to prevent Plaintiff Hall of "disposing of, transferring, or otherwise absconding with assets pending the resolution of [the] action." (Compl. P. 32).

338. The complaint sought punitive damages, treble damages from KCA and resulted in KCA's liability insurance carrier spending well in excess of $100,000 in attorney fees.

339. Defendant Liles knew when the complaint was filed and summons issued that said complaint was not supported by law or fact, but that fraud on the Court was perpetuated to attempt to make the complaint viable for a period of time to accomplish another purpose.

340. The complaint's collateral purpose was to attempt to damage Plaintiff Hall's reputation and cause Plaintiff Hall the loss of his position as Principal at Anderson Creek Club Charter School, and further damage Plaintiff Hall's credibility and ruin Plaintiff Hall's future in his chosen profession as an educator.

341. Plaintiff Hall did in fact have his contract at Anderson Creek Club Charter School *inter alia* terminated purportedly because of the lawsuit State V. KCA.

### SPECIAL DAMAGES

342. Plaintiff Hall was part of a company in Delaware that was under contract to open a charter school in Delaware, but the effort was thwarted as a result of the lawsuit resulting in the loss of an estimated $2 million in earnings over time.

343. Plaintiff Hall's business opportunity to partner with Anderson Creek Club Developers was thwarted by the lawsuit resulting in loss of future income estimated in excess of $10 million.

344. Plaintiff Hall wrote a book entitled "Seven Steps" to open a public charter school and this lawsuit damaged Plaintiff Hall credibility to the loss of future income estimated in excess of $10 million.

345. Plaintiff Hall loss on the un-recovered portion of his contract with ACCCS is estimated at $240,000.00.

346. Plaintiff Hall was working with potential investors to establish a Southeast Crescent Regional Charter School Corporation which was thwarted by the lawsuit resulting in loss of future income estimated at $25 million.

347. Plaintiff Hall total losses, including future income, is estimated at $47.24 million proximately caused by Defendants.

348. Defendants Schauss and Bruton started a conspiracy where state officials openly and actively disrupted KCA 2013-2014 student enrollment and subsequently filed a failed lawsuit against Plaintiff Hall claiming that KCA's not meet its student enrollment goal was somehow a fraud committed by Plaintiff Hall.

349. Defendants Schauss and Bruton's conspiracy cast a shadow over Plaintiff Hall, his wife, and families, lives for nearly ten (10) years.

## COUNT ONE

### 42 U.S.C. § 1983

### Violation of Equal Protection

350. The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

351. Plaintiff Hall was treated differently from others similarly situated persons within the State of North Carolina by Defendants acting under color of state law.

352. The unequal treatment received by Plaintiff Hall at the hands of the Defendants was based on legally impermissible classifications, namely race and for exercising First Amendment U.S. Constitutional Rights.

353. Defendants acted with discriminatory intent in applying these classifications to Plaintiff Hall and the conduct deprived Plaintiff Hall of rights, privileges, and immunities protected by the Constitution or laws of the United States.

354. Plaintiff Hall suffered and continues to suffer injury proximately caused by Defendants discriminatory classifications and violation of Plaintiff Hall right to equal protection under the law.

355. Plaintiff Hall's injuries suffered include but are not limited to monetary loss, extreme emotional distress, mental anguish, emotional distress, loss of standing in the community, and loss of economic opportunity.

## COUNT TWO

## 42 U.S.C. § 1983

## Violation of Due Process of Law

356. The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

357. Plaintiff Hall possessed both a liberty and property interest in practicing his profession and having the right to work as an educator protected by the U.S. Constitution.

358. Plaintiff Hall was intentionally, maliciously, and corruptly deprived of his Constitutional Rights by the Defendants under color of state law when said Defendants engaged in prohibited conduct.

359. As a proximate consequence of Defendants misconduct Plaintiff Hall suffered and continues of suffer injuries, including but not limited to monetary loss, mental anguish, extreme emotional distress, loss of standing in the community, and loss of economic opportunity.

-56-

## COUNT THREE

## 42 U.S.C. § 1985

## Conspiracy to Interfere with Civil Rights

360. The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

361. Defendants did in fact, within the State of North Carolina, conspire together for the purpose of depriving Plaintiff Hall of the equal protection of the laws, substantive and procedural due process, and equal privileges and immunities under the law.

362. Defendants did in fact engage in overt acts in furtherance of their conspiracy.

363. As a proximate consequence of Defendants conspiracy Plaintiff Hall suffered and continues of suffer damages, including but not limited to monetary loss, mental anguish, extreme emotional distress, loss of standing in the community, and loss of economic opportunity.

## COUNT FOUR

## Malicious Prosecution

364. The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

365. Defendants instituted and caused a civil proceeding to be continued against Plaintiff Hall without probable cause.

366. Defendants instituted and continued the civil proceeding against Plaintiff Hall with malice, motive of ill will, spite, grudge, revenge, and oppression.

367. The proceeding instituted and continued by Defendants against Plaintiff Hall was terminated in Plaintiff Hall's favor.

368.     As a proximate consequence of Defendants malicious prosecution Plaintiff Hall suffered damages, including special damages estimated at $47.24 million.

## COUNT FIVE

### Abuse of Process

369.     The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

370.     Defendants invoked process, including filing complaint and issuing summon against Plaintiff Hall on or about April 26, 2016 in the Wake County Superior Court civil action entitled "STATE OF NORTH CAROLINA, ex rel. ROY COOPER, ATTORNEY GENERAL v. KINSTON CHARTER ACADEMY, A North Carolina non-profit corporation; OZIE L. HALL, JR., individually and as Chief Executive Officer of Kinston Charter Academy; and DEMYRA MCDONALD HALL, individually and as Board Chair of Kinston Charter Academy, Wake County Superior Court File No. 16 CVS 5628.

371.     Defendants' invocation of process against Plaintiff Hall had an ulterior purpose, namely, to destroy Plaintiff Hall's reputation and standing in the community as a civil rights advocate and cause his termination of employee at ACCCS as opposed to the seeking legitimate redress of any conduct on the part of Plaintiff Hall that allegedly violated any laws.

372.     After said process was issued, Defendants intentionally used the process invoked against Plaintiff Hall to accomplish the Defendants ulterior purpose.

373.     As a proximate consequence of Defendants abuse of process Plaintiff Hall suffered and continues to suffer damages, including but not limited to monetary loss, mental

-58-

anguish, extreme emotional distress, loss of standing in the community, and loss of economic opportunity.

## COUNT SIX

### Civil Conspiracy

374. The allegations of this complaint preceding and subsequent are hereby restated and hereby incorporated into this Count by this reference.

375. Defendants Liles, Bass, Schauss, Kerr, and Bruton agreed to engage in conduct designed to damage Plaintiff Hall's reputation and standing in the community as a civil rights advocate by both legal and illegal means, to retaliate against Plaintiff Hall for complaining about Defendant Bruton misconduct, generally to violate Plaintiff Hall's legal interest and rights.

376. One or more of the Defendants to said agreement then committed overt acts in furtherance of the aims of the agreement.

377. Acts committed in furtherance of the aims of the agreement proximately caused damages to Plaintiff Hall, including but not limited to monetary loss, mental anguish, extreme emotional distress, loss of standing in the community, and loss of economic opportunity.

## COUNT SEVEN

### Violation of N.C. Constitution

378. The allegations contained in this complaint, preceding and subsequent, are hereby restated and incorporated by this reference.

-59-

379. The Defendant State of North Carolina, via its officers, agents, and employee herein acting in their individual and official capacities did violate Plaintiff Hall's rights under the North Carolina Constitution to equal protection of the law.

380. Defendants violated Plaintiff Hall's right to equal protection of the law when said Defendants engaged in a pattern of conducted that treated Plaintiff Hall differently from all other North Carolina citizens and acted with racial animus, retaliatory intent, and a desire to maliciously violate Plaintiff Hall's constitutional and civil rights.

381. Defendant knew or should have known that if they violated Plaintiff Hall's right to equal protection of the law that the Plaintiff would suffer damages.

382. Defendants pursued their course of conduct, and it did in fact result in damages to Plaintiff proximately caused by Defendants misconduct, including but not limited to emotional distress, general damages, and special damages in excess of $47.24 million.

## COUNT EIGHT

### Punitive Damages

383. The allegations contained in this complaint, preceding and subsequent, are hereby restated and incorporated by this reference.

384. Plaintiff seeks punitive damages from Defendants as punishment for egregious, wrongful, intentional, oppressive, and malicious unlawful actions pursuant to 42 U.S.C. § 1983 and pursuant to N.C. Gen. Stat. § 1D-1 et seq. or other applicable statutes or common law provisions.

-60-

## COUNT NINE

### Declaratory Judgment

385. The allegations contained in this complaint, preceding and subsequent, are hereby restated and incorporated by this reference.

386. Plaintiff Hall seeks a declaratory judgment, pursuant to F.R.Civ.P., Rule 57, by this Count, as a positive assertion that Plaintiff Hall did not "mismanage" KCA, did not violate the N.C. False Claims Act, and to establish by positive assertion that Plaintiff Hall was maliciously prosecuted and both his state and federal constitutional rights were violated by the Defendants.

## COUNT TEN

### Mandatory and Permanent Injunction

387. The allegations contained in this complaint, preceding and subsequent, are hereby restated and incorporated by this reference.

388. Plaintiff seeks a mandatory and permanent injunction prohibiting further retaliation against Plaintiff Hall and an order directing the State of North Carolina place in the public records an apology to Plaintiff Hall and public statement exonerating Plaintiff Hall of all accusation that were made.

## RELIEF

WHEREFORE, Plaintiff hereby requests the following relief:

1. Jury trial on all issues triable.

2. Compensatory Damages.

3. Special Damages.

4. Mandatory and Permanent Injunction.

-61-

5. Punitive Damages

6. Declaratory Judgment

7. Any other relief deemed just and proper.

This the 24ᵗʰ day of ___April___, 2023.

Respectfully submitted,

Ozie L. Hall
56 Falling Water Road
Spring Lake, NC   28390
Telephone: (252) 520-3397
Email: oziehall@yahoo.com

## VERIFICATION

The undersigned hereby certifies that the allegations contained in the foregoing complaint are true and correct to the best of my knowledge, except as to those matters stated on information and belief, and as to those matters it is believed to be true.

Ozie L. Hall

Sworn to and subscribed to before me, a Notary Public of the State of North Carolina, __Cumberland__ County. This the 24 day of ___April___, 2023.

SEAL

NOTARY PUBLIC

My Commission Expires on Aug 28, 2027.

Ashanti Norris
Notary Public
Cumberland County, NC
My Commission Expires: Aug 28, 2027

-62-